# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUSTO R. DUCHIMAZA and
CECILIA'S MARKET, LLC,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA and THOMAS
VILSACK, SECRETARY, UNITED STATES
DEPARTMENT OF AGRICULTURE,

    Defendants.

No. 3:14-cv-00887 (MPS)

## MEMORANDUM AND ORDER ON MOTIONS

This action arises from an administrative determination by the United States Department of Agriculture that Cecilia's Market, LLC, owned and operated by Justo Duchimaza, was engaged in the "trafficking" of benefits provided by the Supplemental Nutrition Assistance Program ("SNAP"), which in this context means exchanging SNAP benefits for cash. On the basis of that determination, Cecilia's Market, LLC, and Duchimaza ("Plaintiffs") were permanently disqualified from participating in SNAP. Plaintiffs bring this action under 7 U.S.C. § 2023(a)(13) to set aside the determination and reverse the permanent disqualification penalty. Defendants have moved for summary judgment and have filed a separate motion in limine to preclude Plaintiffs' expert. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED in all respects, and because I conclude that the opinions of Plaintiffs' expert would not raise a genuine issue of material fact if they were considered, I DENY the motion in limine as moot.[1]

---

[1] Plaintiffs also named Thomas Vilsack, the Secretary of Agriculture as a Defendant in this case. The United States of America is the only proper Defendant in this case, because the Food Stamp Act only allows suits "against the United States." 7 U.S.C. § 2023(a)(13). The United States has not waived sovereign immunity as to any claims under the Food Stamp Act against the Secretary of Agriculture. *Arias v. United States*, 2014 WL 5004409, at *14 (S.D.N.Y. Sept. 29, 2014). Therefore, the claim against Secretary Vilsack is dismissed.

I.   **Background**

A.  **SNAP and Trafficking**

The Supplemental Nutrition Assistance Program ("SNAP"), established pursuant to the Food Stamp Act, allows "low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011.  The Secretary of Agriculture is directed to "issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program."  7 U.S.C. § 2013(c). The Food and Nutrition Services ("FNS") division of the United States Department of Agriculture administers SNAP.  7 C.F.R. § 271.3.

Households participating in SNAP are provided with Electronic Benefit Transfer ("EBT") Cards, which store benefits that can be used to purchase food at eligible retail stores.  7 C.F.R. § 274.1.  These cards work much like debit cards.  (Affidavit of Vicky Robinson, ECF No. 32-3 at ¶ 8.)  Each month, the cards are credited with a dollar amount of SNAP benefits for the month. (*Id.* at ¶ 9.)  When a SNAP benefit recipient makes a purchase at an authorized store, the amount of the purchase is electronically credited to the store owner's bank account.  (*Id.* at ¶ 10.)  Store owners must be approved by FNS to participate in SNAP.  7 C.F.R. § 278.1.

The SNAP regulations prohibit "trafficking," which is defined to include, among other things, the "buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food." 7 C.F.R. § 271.2; 7 U.S.C. § 2021.  Stores that engage in trafficking of SNAP benefits are subject to permanent disqualification from the program or a civil monetary penalty ("CMP").  7 U.S.C. § 2021(b)(3)(B).  FNS is authorized to disqualify any authorized retail store from participation in the program "if the firm fails to comply with the

Food Stamp Act of 1977." 7 C.F.R. § 278.6. "Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC)." *Id.*

The FNS, through statistical analysis of EBT redemption data "of stores caught in trafficking violations during on-site investigations, [has] found that transactions involving trafficking consistently display particular characteristics or patterns." (ECF No. 32-4 at 190.) The FNS is able to use these data to draw a conclusion by "a preponderance of the evidence" that a store is engaged in trafficking when it notices "unusual, irregular, and inexplicable transactions and patterns" in a store's EBT redemptions. (*Id.*)

If the FNS suspects a store is trafficking, the regulations provide that it will send a charge letter advising "a firm being considered for permanent disqualification based on evidence of trafficking as defined in § 271.2" that it "must notify FNS if the firm desires FNS to consider the sanction of a civil money penalty in lieu of permanent disqualification." 7 C.F.R. § 278.6(b)(2)(i). The FNS may impose a civil money penalty in lieu of disqualification if it determines that "a disqualification would cause hardship to participating households." 7 C.F.R. § 278.6(a). However, "[i]f a firm fails to request consideration for a civil money penalty in lieu of a permanent disqualification for trafficking and submit documentation and evidence of its eligibility within the 10 days [of receipt of the charge letter], the firm shall not be eligible for such a penalty." 7 C.F.R. § 278.6(b)(2)(iii). In addition, to qualify for a civil money penalty instead of permanent disqualification, the store owner must timely submit "substantial evidence" showing that the store meets the following four criteria:

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations . . . .

7 C.F.R. § 278.6(i).

The "appropriate FNS regional office" will then review the "letter of charges, the response, and any other information available to FNS" and issue a determination as to whether the store was trafficking and the appropriate penalty. 7 C.F.R. § 278.6(c). Stores can then appeal this determination to the Administrative Review Branch within ten days of the delivery of the decision from FNS. 7 C.F.R. § 279.2. Stores may file "written information in support of [their] position" along with the request for review. 7 C.F.R. § 279.4(b). The designated reviewer "shall make a determination based upon:

(1) The information submitted by the appropriate FNS office;

(2) Information submitted by the firm in support of its position; and

(3) Any additional information, in writing, obtained by the designated reviewer from any other person having relevant information."

7 C.F.R. § 279.5.

The statute allows for judicial review of a final agency decision within thirty days of service of the final notice. 7 U.S.C. § 2023(a)(13). The suit in federal district court "shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15).

**B. Factual Background**

1. *Investigation of Plaintiffs*

Plaintiff Justo Duchimaza owns and operates a small grocery store called Cecilia's Market located in New Haven, Connecticut. (Compl., ECF No. 1 at ¶ 1; Declaration of Vicky T. Robinson, ECF No. 32-3 at ¶ 19; ECF No. 32-4 at 8.) Cecilia's Market was approved as an authorized retail food store on September 10, 2010. (Def.'s MSJ Ex. A, ECF No. 32-4, at 4.) On September 24, 2013, a Food and Nutrition Services ("FNS") contractor conducted a store visit to Cecilia's Market to observe the nature and scope of the store's operation, stock, and facilities. (*See id.* at 12-48.) The contractor documented the visit with a report and took photographs of the store. (*Id.*) The report also included information about the store, including an evaluation of the store's inventory, a hand-drawn map of the store's layout, and limited pricing data. (*Id.*)

After the EBT Alert system identified a number of suspicious transactions that suggested possible trafficking violations, the matter was referred to Program Specialist Richard O'Toole for investigation. (*Id.* at 49-61.) O'Toole conducted an EBT Case Analysis, which analyzed EBT Transaction Data for the months of October, November, and December 2013. (*Id.*) Based on the EBT analysis, the FNS contractor's visit to the store, and a comparison to competing stores in the area, O'Toole concluded that there were "clear and repetitive patterns of unusual, irregular, and inexplicable SNAP activity, which would warrant issuance of a trafficking charge letter." (*Id.* at 59.) He recommended to FNS Section Chief Gilda Torres that FNS charge Cecilia's Market with trafficking. (*Id.*)

2. *FNS Charge Letter to Plaintiffs*

On January 13, 2014, the FNS sent a letter to the Plaintiffs accusing them of trafficking as defined in Section 271.2 of the SNAP regulations, i.e., the "exchange of SNAP benefits . . . for

cash." (*Id.* at 60.)  Specifically, the letter accused Cecilia's Market of 388 violations of SNAP regulations, separated into three categories, and included three attachments that identified the EBT transactions in each category.   (*Id.* at 63-73.)   The three categories of EBT patterns that FNS considered suggestive of trafficking were:  (1) an "unusual number of transactions ending in same cents values" ("Attachment 1"); (2) "multiple transactions . . . made from individual benefit accounts in unusually short time frames" ("Attachment 2"); and (3) "excessively large purchase transactions . . . made from recipient accounts" ("Attachment 3").  (*Id.* at 60.)

The letter informed Plaintiffs that they would be permanently disqualified from SNAP if FNS determined that they committed the violations detailed in the letter and invited them to respond to the charges with additional information.  (*Id.* at 61.)  The letter also informed Plaintiffs that if they met certain conditions, "FNS may impose a civil money penalty (CMP) . . . in lieu of permanent disqualification." (*Id.* at 60.)  The letter detailed what the Plaintiffs would need to show to qualify for a CMP.  (*Id.*)   Finally, the letter advised Plaintiffs that they had ten days to respond to the charges, ask for a CMP instead of a permanent disqualification, and submit any documentation.  (*Id.* at 60-61.)

### 3.  *Plaintiff's Response to Charge Letter*

On January 17, 2014, Plaintiffs, through their accountant, Sylvia Greenfield, responded to the charge letter denying all accusations and addressing the three categories of EBT Data included in the FNS's charge letter. (*Id.* at 75.)   The response included a price list of "most commonly purchased items" (*id.* at 110), worksheets of five households and their EBT purchases at Cecilia's Market (i*d.* at 111-144), records of credit given to customers (*id.*), receipts highlighting unusual

food items available at Cecilia's Market (*id.* at 76, 145), and photos of the store's inventory.[2]  (*Id.* at 169.)  The response argued that all three categories of transactions could be explained by "customer behavior, sales quantities, and products sold which are not normally found in this type of store."  (*Id.* at 77.)  The response did not request a CMP or provide any evidence showing that Plaintiffs were entitled to one.  (*Id.* at 75.)

### 4.  *Disqualification Determination*

Upon reviewing the materials and explanations submitted by Greenfield, O'Toole recommended that Cecilia's Market be permanently disqualified from SNAP.  (*Id.* at 94.)  He determined that the explanations provided by Greenfield lacked merit and that Cecilia's Market did not qualify for a CMP instead of permanent disqualification because the response provided no evidence that Cecilia's Market met the four criteria set forth in 7 C.F.R. § 278.6(i).  (*Id.* at 93.)

In a letter dated February 12, 2014, FNS informed Plaintiffs that they had been permanently disqualified from the SNAP program.  (*Id.* at 95.)  The letter informed Plaintiffs of their right to appeal the decision to the Chief of the Administrative Review Branch within ten calendar days of receipt of the letter.  (*Id.*)

### 5.  *Administrative Review and Final Agency Determination*

On February 19, 2014, Plaintiffs appealed the decision to the Chief of the Administrative Review Branch.  (*Id.* at 98.)  The case was assigned to Administrative Review Officer Madeline Viens.  (*Id.* at 102.)  Plaintiffs, through their lawyer, submitted the same exhibits that were earlier submitted by the accountant, along with explanations that were similar.  (*Id.* at 107.)  On May 13,

---

[2] The record includes only one set of exhibits, which appear after the later letter by Plaintiffs' attorney appealing to the Administrative Review Branch.  Ms. Greenfield's response appears to refer to the same exhibits, however, and thus I infer that she sent those exhibits with her response to the charge letter.

2014, after conducting a review, the Administrative Review Branch issue a final decision affirming the permanent disqualification of Cecilia's Market.  (*Id.* at 181-91.)

## II.   <u>Legal Standards</u>

### A.  Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citations and internal quotation marks omitted).  In addressing the motion, the Court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.  More specifically, [the opposing party] . . . may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

### B.  De Novo Review Standard

A retailer aggrieved by a final determination of a disqualification from SNAP "may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination."  7 U.S.C. § 2023(a)(13).  "The suit in the United States district court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue."  7 U.S.C. § 2023(a)(15).  The district court is required

"to reexamine the agency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence." *Ibrahim v. U.S. Through Dep't of Agric.*, 834 F.2d 52, 52–53 (2d Cir. 1987); *see also Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997) ("A trial de novo is a trial which is not limited to the administrative record – the plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency.") (internal quotation marks and citations omitted).  "As a result, the district court must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." *Ibrahim*, 834 F.2d at 53-54 (internal citations omitted).

Although the Court of Appeals for the Second Circuit has apparently not addressed this issue, district courts within the Circuit, as well as other Courts of Appeals, have held that "[p]laintiffs, as the parties challenging their permanent disqualification from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was invalid." *Arias v. United States*, 2014 WL 5004409, at *6 (S.D.N.Y. Sept. 29, 2014) (*citing Hernandez v. U.S. Dep't of Agric. Food & Consumer Serv.,* 961 F.Supp. 483, 485 (W.D.N.Y. 1997); *Fells v. United States,* 627 F.3d 1250, 1253 (7th Cir. 2010) ("Although the statute itself is silent as to the issue of which party bears the burden of proof in a trial de novo under § 2023, other circuits have held consistently that, given the nature of the statutory scheme, a store owner who seeks to set aside an agency action bears the burden of proof."); *Warren v. United States,* 932 F.2d 582, 586 (6th Cir. 1991); *Redmond v. United States,* 507 F.2d 1007, 1011–12 (5th Cir. 1975) ("By according the administrative action in question a presumption of validity, the statute recognizes the initial investigation and determination of the agency.")).  "Summary judgment has been held to be appropriate on *de novo* judicial review of a disqualification of a retail food store from participating

in the food stamp program if no genuine issue of material fact exists." *Kassem v. United States*, 2003 WL 21382906, at *2 (W.D.N.Y. Apr. 15, 2003); *see also Nagi v. United States*, 1997 WL 252034, at *2 (S.D.N.Y. May 14, 1997), *Nadia Int'l Mkt. v. United States*, 2015 WL 7854290, at *4 (D. Vt. Dec. 2, 2015), *appeal dismissed* (July 28, 2016).

**III.   Discussion**

**A.  Motion in Limine Regarding Plaintiffs' Expert Witness**

Plaintiffs retained Richard Mellinger as an expert witness in this case and included his report in their papers opposing summary judgment. (ECF No. 31-2; ECF No. 40-3.) Mr. Mellinger opines in his report "that it is more likely <u>not</u> true than true" that the trafficking violations cited by the FNS occurred as charged. (ECF No. 31-2 at 13 (emphasis in original).) The Defendants filed a motion in limine to exclude Mr. Mellinger's testimony, arguing that he is not qualified, his methodology is unreliable, and his opinions invade the province of the Court. (ECF No. 31.)

Fed. R. Evid. 702 governs testimony by expert witnesses and provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    **(b)** the testimony is based on sufficient facts or data;

    **(c)** the testimony is the product of reliable principles and methods; and

    **(d)** the expert has reliably applied the principles and methods to the facts of the case.

"The Second Circuit and courts within this circuit have liberally construed expert qualification requirements." *TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002) (*citing United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements

of Rule 702 "must be read in light of the liberalizing purpose of the rule")).  As set forth in the

advisory committee's notes for the 2000 Amendments to Rule 702, "[n]othing in this amendment

is intended to suggest that experience alone – or experience in conjunction with other knowledge,

skill, training or education – may not provide a sufficient foundation for expert testimony."

Further, as noted in *Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996):

> [i]t is not appropriate to invoke the *Daubert* test in cases where expert testimony is
> based solely on experience or training, as opposed to a methodology or technique.
> Indeed, it would be impossible to do so.  Expert opinion based on personal
> experience cannot always be evaluated on the basis of "rate of error," "peer review"
> or "general acceptance" in the relevant scientific community.  Yet such opinions
> may be as valuable to the trier of fact as those opinions that can be readily gauged
> in such terms.

The expert's qualifications, however, must be relevant to the opinions she offers.  *See Housing*

*Works, Inc. v. Turner*, 362 F. Supp.2d 434, 447-48 & n.83 (S.D.N.Y. 2005) (finding that proposed

expert's testimony on damages incurred by a non-profit did not satisfy "helpfulness" requirement

of Rule 702 where her "relevant expertise is in general nonprofit management" and the primary

focus of her work was "institutional theory, sector theory, governance and boards of directors").

"Whether a witness is qualified as an expert can only be determined by comparing the area in

which the witness has superior knowledge, skill, experience, or education with the subject matter

of the witness's testimony."  *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994) (internal

quotation marks and citation omitted).

When the expert witness employs a methodology or technique, the Court must evaluate the

principles and methodologies employed:

> [I]t is critical that an expert's analysis be reliable at every step. As Chief Judge
> Becker of the Third Circuit has explained, the *Daubert* "requirement that the expert
> testify to scientific knowledge—conclusions supported by good grounds for each
> step in the analysis—means that *any* step that renders the analysis unreliable under
> the *Daubert* factors renders the expert's testimony inadmissible." . . . In deciding
> whether a step in an expert's analysis is unreliable, the district court should

11

undertake a rigorous examination of the facts on which the expert relies, the method
by which the expert draws an opinion from those facts, and how the expert applies
the facts and methods to the case at hand.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (*citing In re Paoli*

*R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir. 1994)).

Mr. Mellinger served as an Administrative Review Officer, a Regional Food Stamp

Program Director, and a Staff Assistant and Policy Analyst for FNS from 1963-1985.  (ECF No.

31-2 at 6.)  He gained all of his experience in retailer compliance at FNS before the agency

implemented the EBT program.  (*Id.* at 28.)  Although he held other positions at FNS as well, he

cited his "22 years in different aspects of retail compliance," i.e., 1963 – 1985, as his principal

qualification to serve as an expert in this case.  (ECF No. 31-2 at 28.)  Mr. Mellinger never analyzed

EBT data during his tenure at FNS, he has never done so before this case, and he has no experience

with FNS charge letters issued on the basis of EBT data.  (*Id.* at 29, 31-32.)  He admitted that he

had no retailer experience with EBT data.  (*Id.* at 33.)  He has authored no publications, and his

resume reflects no training, education, or experience in statistical analysis or EBT data.  (*Id.* at 29.)

When he worked for FNS, FNS brought trafficking charges only if someone had been caught by

an undercover investigator.  (*Id.* at 36.)

Mr. Mellinger did not employ any methodology or technique to develop his opinions other

than to review the same administrative record that is available to the Court.  He draws all of his

conclusions based on his examination of the administrative record; he did not visit Cecilia's

Market, review the underlying transactions, or examine anything other than the record.  (*Id.* at 33.)

He admitted that a layperson "who had mathematical skills" could come up with "the same

analysis" of the "same cent" data set forth in his report.  (*Id.* at 32.)

Mr. Mellinger's report does not dispute the accuracy of the EBT data FNS relied on. Instead, he disagrees with FNS's conclusion that the data support an inference of trafficking. (ECF No. 31-2 at 33 (noting that the FNS "made certain judgments based on data" and that he made "certain judgments based on that same data").) His disagreements, however, boil down to conclusions about the significance of the data observed by FNS. And because these conclusions are not based on any expertise in statistics or in the patterns of EBT transactions that are indicative of trafficking – Mr. Mellinger has none – they do not reflect "scientific, technical, or other specialized knowledge" and are thus not admissible under Rule 702. For example, with regard to "Attachment 1" setting forth the FNS's conclusions about the pattern of "same cent" transactions, he points out that these transactions represented only 5% of the total EBT transactions and, on average, occurred only twice a day during the relevant period. "Therefore," he concludes, "I find that these transactions cannot be considered to be 'routine' nor are they 'disproportional.'" (ECF No. 31-2 at 7.) This is just his own ipse dixit, uninformed by relevant expertise, and would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Indeed, this conclusion merely echoes arguments made by Plaintiffs' counsel during the administrative review process. (ECF No. 32-4 at 108.)

Similarly, with respect to the seventy transactions in "Attachment 2" showing repeated uses of the same EBT card within a 24-hour period, Mellinger opines that "20 of the 29 sets of [repeat transactions on the same card] represented 2 transactions each and … the 2 transactions took place an average of 10 hours apart." (ECF No. 31-2 at 9.) This observation would not assist the finder of fact because it merely points out features of the data that are apparent from the record itself and, again, it is not based on any specialized knowledge.

Although Mr. Mellinger testified in his deposition that some of his conclusions were outside the ken of laypersons (ECF No. 31-2 at 32, 36), that is not evident from his report.  To the contrary, his conclusions about the EBT data cited by FNS in the "multiple transactions" and "high-dollar" transactions categories are very similar to his conclusion about the "same cent" data category, which he admitted a layperson with "mathematical skills" could have reached.   (ECF No. 31-2 at 32.)  Thus, his opinion that the high-dollar transactions observed by FNS "do not really meet the definition of 'repetitive' or 'irregular'" and "are not really unusual" (ECF No. 31-2 at 12) does not appear to be based on specialized knowledge any more than his opinion that the 5% of "same cent" transactions – averaging two per day – observed during the relevant period was not "routine" or "disproportional." (ECF No. 31-2 at 7.)   As noted, he agreed that a layperson with math skills "could … come up with" the latter opinion.  (ECF No. 31-2 at 32.)  His opinion that the transactions in the "multiple transactions" category "do not really meet the definition of 'multiple'" and "did not really take place over 'short time frames'" (ECF No. 31-2 at 10) likewise appears to reflect mere characterizations of the data of the sort that a layperson could make.

While he does appear to have expertise in certain features of FNS's operations and in the SNAP program (at least as it operated in the 1960s, 70s, and 80s), those qualifications appear to be of little value here, where the disqualification is based primarily on EBT data.  His principal critiques of the FNS's conclusions, as shown, amount to little more than recasting the EBT data in a light that is more favorable to Plaintiffs – much the way that a lawyer would do.  Absent some relevant specialized knowledge behind these critiques – and I can find none – they do not meet the requirements of Rule 702.

Nonetheless, because his critiques of the EBT data essentially amount to a supplement to the brief submitted by Plaintiffs' counsel, and because consideration of them would not alter my conclusions, I will consider them where relevant.  I therefore DENY the motion in limine as moot.[3]

**B.  The Trafficking Violation**

As noted, Plaintiffs bear the burden of proving by a preponderance of the evidence that the agency's determination that they engaged in trafficking is "invalid."  *See Arias*, 2014 WL 5004409, at *6.  Moreover, authorized stores may be permanently disqualified upon "the first occasion" of trafficking.  7 U.S.C. § 2021(b)(3)(B).  Thus, to defeat summary judgment, Plaintiffs must submit evidence from which a reasonable juror could conclude that the agency's determination is "invalid" with respect to each cited instance of trafficking.  *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000) ("Since permanent disqualification is warranted on 'the first occasion' of coupon trafficking, it is Plaintiff's burden to raise material issues of fact as to each of the transactions set forth as suspicious by the FNS.").  The Government argues that it is entitled to summary judgment because the Plaintiffs have failed to meet their burden of establishing that the trafficking determination is invalid.  For the reasons set forth below, I agree.

Plaintiffs do not contest the accuracy of the EBT data underlying the finding of trafficking; rather, their first argument contests the validity of basing disqualification decisions on a "computer generated printout of statistics" at all.  (Plaintiffs' Objection, ECF No. 40 at 2.)  This argument fails because the Government may permanently disqualify a retailer on the basis of EBT data.  *See Idias v. United States*, 359 F.3d 695, 698 (4th Cir. 2004); *Arias*, 2014 WL 5004409, at *6.  The

---

[3] Plaintiffs also submitted an affidavit from their accountant, Sylvia Greenfield, in response to the Defendants' Motion for Summary Judgment.  The affidavit states that in Ms. Greenfield's professional opinion "there was no trafficking at Cecilia's Market during this period."  (ECF No. 40-1 at 2.)  Ms. Greenfield was not disclosed to the Defendant as an expert witness, and her opinion is conclusory.  Nothing in her affidavit suggests the reasons she believes that there was no trafficking, or offers any sort of explanation based in fact.  Thus, I will not consider her affidavit in deciding this motion.

regulations authorize the FNS to disqualify a store permanently "on the basis of evidence that may include facts established through on-site investigations, *inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system,* or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), as specified in paragraph (e)(8) of this section."  7 C.F.R. § 278.6 (emphasis added).  Notably, the provision uses "or," meaning that any one of these bases for disqualification is sufficient.  And as discussed by the Fourth Circuit:

> There can also be little question that the United States was entitled to use this sort of documentary evidence to prove that Idias trafficked in food stamps. *See Kahin v. United States,* 101 F.Supp.2d 1299, 1303–04 (S.D.Cal.2000) (rejecting the notion that store personnel must be caught "red-handed" trafficking in food stamps). Congress expressly authorized the FNS to consider "evidence obtained through a transaction report under an electronic benefit system" in disqualifying food stores for food stamp trafficking. 7 U.S.C. § 2021(a). And the FNS has done exactly that, issuing regulations that permit a food store to be disqualified from the Food Stamp Program on the basis of "inconsistent redemption data" or "evidence obtained through [an EBT] transaction report." 7 C.F.R. § 278.6(a). Indeed, one of the advantages of replacing traditional paper food stamps with the EBT system was that it made it easier to detect trafficking, *see* 5 West's Fed. Admin. Prac. § 5785 (3d ed.), particularly in more closely-knit communities where undercover evidence can be difficult and costly to obtain.

*Idias*, 359 F.3d at 698 (affirming summary judgment against store in SNAP trafficking case even where store controverted some of the Government's evidence).  Furthermore, in this case the Government relies on more than just the data:  the FNS sent a contractor to conduct an in-person visit, examined photographs, and compared the EBT data to that of two similar stores in the same area.  (*See* ECF No. 32-4 at 49-59.)

The EBT data and other evidence that the Government points to in its motion meets its burden of demonstrating the absence of a genuine issue of material fact.  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More

specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.,* 781 F.3d 42, 44 (2d Cir. 2015).  Plaintiffs argue that summary judgment should be denied because there are other "plausible explanations" for the patterns in the EBT data that do not involve trafficking.  (*Id.* at 2-3.)  As noted, their expert witness agrees that they have provided plausible and innocent explanations for the patterns in the data. (ECF No. 31-2.)  I evaluate below the evidence that Plaintiffs have provided in each of the three categories of EBT data, or "attachments," on which the FNS has relied.  After doing so, I conclude that while Plaintiffs have created a genuine issue of fact as to Attachment 1, they have not with respect to Attachments 2 and 3.  Thus, I grant summary judgment as to the issue of whether Plaintiffs were engaged in trafficking.

1. *Attachment 1: Unusual Number of Transactions Ending in Same Cents Values*

The FNS first cited 197 EBT transactions over three months ending in .00 cent or .50 cent amounts and totaling $2,784.50 in SNAP benefits, which it determined was disproportionate based on its comparison to nearby, similar stores.  An unusually large number of same cent value transactions is one of the patterns shown in Government investigations of known trafficking to be associated with trafficking activity.  (ECF No. 32-4 at 190.)  The FNS concluded that the transaction amounts in this category were "contrived."  (ECF No. 32-4 at 50.)

The Plaintiffs have offered multiple explanations for the transactions ending in same cent values.  (*See id.* at 75; ECF No. 40-2.)  First, they argue that Cecilia's Market includes sales tax in the pricing, which leads to more transactions ending in same cent values.  SNAP purchases are excluded from sales tax, however, and applying a fixed percentage to a random set of transaction prices would not in any event increase the likelihood that those prices would end in .00 cent or .50

cent values.  Thus, this explanation does not raise a genuine issue of material fact as to the validity of the FNS's conclusions.   Second, Plaintiffs assert that customers routinely round up their purchases by buying candy or snacks at the register, because they prefer to have same cent transactions.  Plaintiffs offer no evidence to support this assertion – such as customer affidavits – and it is, in any event, implausible.  Given the financial circumstances of the customers, it is not plausible that these customers, requiring assistance from the federal government to purchase food each month, would spend additional money merely to ensure that the transactions that end in .00 or .50.   Thus, Plaintiffs' "explanations" are speculative and do not create a genuine issue of material fact.

Mr. Mellinger's analysis of Attachment 1 fares no better.  He states that the number of same cent transactions is not unusual because the total number of same cent transactions was only 5% of the total transactions and the store conducted only an average of two same cent transactions per day.  (ECF No. 31-2 at 12.)  As discussed above, however, Mr. Mellinger's lack of expertise in statistics or EBT data analysis deprives this observation of any weight.  He is simply unable to say whether or not same cent transactions amounting to 5% of the total is statistically significant or consistent with patterns of EBT purchases observed in known cases of trafficking.  He also suggests that the store "could have conducted that many even cents transactions" over the period on the basis of the price list.  (*Id.* at 13.)  This opinion is merely a restatement of the Plaintiffs' explanation, and does not provide anything other than speculation.

One explanation for the transactions that Mr. Duchimaza puts forth in his affidavit, however, does create a genuine issue of material fact.  (ECF No. 40-2 at 3.)  Mr. Duchimaza submitted a price list of all of the items in the store that end in same cents values.  The list includes 32 commonly purchased items with prices ending in .00, .25, and .50.  (ECF No. 32-4 at 110.)

These items include meat, cheese, and milk.  The administrative record does not contain any photographs that show pricing aside from the hot food bar, which the Government concedes is not eligible for SNAP purchases.  (*Id.* at 90.)

The Government has not provided any evidence to show that the price list that Plaintiffs submitted is not genuine.  The Government simply speculates that the Plaintiffs did not have the capacity to sell frozen food.  Plaintiffs have provided a photo, however, of a stand-up freezer they claim to use to sell such food and the Administrative Record includes a photograph of the outside of the store that advertises, among other things, "frozen food."  (ECF No. 32-4 at 174, 23.)  Thus, the Plaintiffs have provided evidence to support a plausible alternative explanation for the same cent transactions and have created a genuine issue of material fact as to whether the same cent transactions indicate trafficking.

2. *Attachment 2:  Multiple Transactions from the Same Account within Short Time Frames*

Next, the FNS identified 70 EBT transactions where multiple withdrawals were made from the account of a single SNAP household within 24 hours:  "Multiple transactions, conducted within a 24 hour period, are methods which stores use to avoid single high dollar transactions that cannot be supported and are suggestive of trafficking."  (ECF No. 32-4 at 52.)  The 70 transactions were grouped in 29 "sets," and in each set the EBT Card user depleted between $101.06 and $336.69 of EBT benefits in a 24 hour period.  (*Id.* at 187.)  The time between transactions in each set ranged from 69 minutes to 24 hours.  (*Id.* at 82-85.)  These transactions totaled $4,497.93 in SNAP benefits. (*Id.*)  In addition, FNS compared Cecilia's Market with two other similar, nearby grocery stores for the same period and found that neither store had *any* such transactions.  (*Id.* at 188.)

Plaintiffs offer three explanations for these transactions, all of which fail because they consist of conclusory assertions for which Plaintiffs provide no evidence.  (ECF No. 40-2.)  First,

they suggest that several regular customers have large families whose members use the same EBT card. (*Id.* at 108.)  Different family members come in throughout the day, Plaintiffs suggest, and use the same card to make purchases.   In support of this argument, Plaintiffs provided "worksheets" of the customer records of five SNAP recipients, along with transaction receipts. (*Id.* at 111-136.)   These worksheets and receipts do not support their argument.   There is no evidence that the transactions shown in the receipts actually involved large families.   The receipts and worksheets amount to no more than a list of the suspicious transactions themselves; they do not itemize the purchases made or show anything other than that SNAP benefits were drawn multiple times from the same account within a 24-hour period.   There is nothing showing that the purchases were made by multiple persons rather than a single person.   These documents thus do not create a genuine issue of material fact as they do not make the FNS's interpretation of the data any less convincing.   Plaintiffs' assertion that members of the same family would visit the store on the same day is simply a conclusion; Plaintiffs cite no examples, provide no data, and do not even attempt to account for the specific transactions the FNS identified in this category.   In other words, the Plaintiffs' evidence does not suggest that the Defendant's determination was invalid.

Plaintiffs also suggest that the transactions are a result of their location, which is "next to housing projects."  (ECF No. 32-4 at 26.)  They suggest that the store's location led to more transactions involving one family, and that multiple family members would come in to the store throughout the day and use SNAP benefits.  Again, there is no evidence presented to support this explanation.   "[F]actually unsupported arguments do not create a genuine dispute about the legitimacy of the irregular EBT transactions." *Rodriguez Grocery & Deli v. U.S., Dep't of Agric. Food & Nutrition Serv.,* 2011 WL 1838290, at *4 (D. Md. May 12, 2011).

In addition, FNS compared the EBT data from Cecilia's Market with two nearby, similar stores – Super Star Market, located .34 miles away, and Eddie's Market, located .29 miles away. (ECF No. 32-4 at 54, 187.)  Based on FNS records of the contractor visits, the two stores were categorized as "small groceries" with stock similar to that of Cecilia's Market.  (*Id.*)  The FNS noted that "there is nothing in contractor's store visit that explains" the dramatic differences in this category of transactions between the two nearby competing stores and Cecilia's Market.  (*Id.* at 57.)  While Cecilia's Market had 70 suspicious multiple withdrawal transactions during the time period, the comparison stores had no transactions of the same nature.  (*Id.* at 188.)  If the location explained the suspicious transactions, then the two nearby stores would likely have experienced at least some similar transactions.  But they did not.

Finally, Plaintiffs argue that the transactions stem from their practice of extending credit to customers:  the customers pay their balance when they receive their benefits and make new purchases as well.  (ECF No. 40-2 at 3; ECF No. 40 at 6.)  There are two problems with this argument.  First, stores are prohibited under the SNAP regulations from accepting SNAP benefits for credit.  7 C.F.R. § 278.2(f).  Second, Plaintiffs have provided evidence of extending credit to only five households, and the receipts and worksheets provided for four of those households do not even relate to the suspicious transactions identified by the FNS.  (ECF No. 32-4 at 82-85, 111-136.)  For example, Household 9370 accounts for seven of the 29 sets flagged by FNS as suspicious, but Plaintiffs have not provided evidence that any of the transactions in those seven sets were to pay off a credit balance.  (*Id.* at 111.)  The only apparent credit pay-off for Household 9370 occurred on November 2, 2013, and this is not one of the transactions flagged by FNS.  (*Id.* at 111, 82-83.)  Similarly, Household 4954 accounts for three of the flagged sets – including transactions that occurred on October 1, 2013, November 7, 2013, and December 3-4, 2013 – but

the only apparent credit pay-offs occurred on November 1, 2013 and December 1, 2013.  (*Id.* at 82-85, 120-21.)  In fact, the only match in these records is for Household 5127, which accounts for two of the flagged sets.  (*Id.* at 82-85.)  Even in that case, Plaintiffs have submitted evidence that only one of the sets resulted from a credit pay-off:  the set of transactions that occurred on December 6, 2013.  (*Id.* at 131.)  Third, the occasional credit "pay-offs" shown on the worksheets do not fit Plaintiffs' account of a customer who pays off his "tab" and then buys his groceries during a single trip to the market.  For example, in one worksheet, for "Household 5127," the "pay-off" is sandwiched between two other transactions occurring on December 6, 2013 – one occurring 63 minutes before the "pay-off" and one occurring 5 hours after.  (*Id.* at 134.)  Thus, the evidence presented does not match Plaintiffs' explanation and does not help them meet their burden of raising a genuine dispute of material fact regarding the FNS's conclusion that the multiple transactions in rapid succession indicated trafficking.  *See, e.g., Nadia Int'l Mkt. v. United States*, at *6 (D. Vt. Dec. 2, 2015), *appeal dismissed* (July 28, 2016) (granting summary judgment where the plaintiff was able to attribute only three of the suspicious transactions to charges made against credit accounts).

Mr. Mellinger's analysis similarly does not create any genuine issue of material fact.  He opines that the multiple transactions are not "convincing evidence of trafficking" because it is "entirely possible" that the Plaintiffs are correct that multiple family members use the same card and the lack of records of credit transactions "does not rule out the possibility" that some of the transactions were credit pay-offs.  (ECF No. 31-2 at 12.)  Again, these statements do not rely on any facts, but simply restate the Plaintiffs' explanations in the form of opinions, none of which, as noted, is supported by relevant expertise.  Mr. Mellinger also quibbles with the FNS's definitions

of "multiple" and "short time frame," but again, offers no evidence to rebut FNS's conclusion that these data are consistent with trafficking. (*Id.*)

The receipts and worksheets Plaintiffs have submitted – even if they do provide some evidence of credit transactions – do not make it less likely that the observed pattern of a large number of serial transactions within 24 hours is indicative of trafficking. *Rodriguez*¸ 2011 WL 1838290 at *3 ("Trafficking may be shown by irregular patterns in a store's EBT data, even if some irregularities can be explained by legitimate customer behaviors.").   And other than the receipts, Plaintiffs provide only vague assertions unattached to particular EBT data to support their explanations for these suspicious transactions. (*See, e.g*., Duchimaza Aff., ECF No. 40-2 at 3 ("As a result [of extending credit], many times there would be one transaction to settle-up the old debt and another transaction to purchase a new item.").)

### 3.  *Attachment 3:  High Dollar Value Transactions*

Finally, the FNS identified 121 "excessively large" EBT transactions (greater than $49.88) totaling $10,143.91 in SNAP benefits. (ECF No. 32-4 at 188.) An unusual number of high-dollar transactions is likewise an indicator of trafficking based on Government analysis of stores caught in trafficking violations during on-site investigations. (*Id.* at 190.) In this case, the large number of high-dollar transactions was also at odds with the store's physical characteristics.  The store occupies 2,000 square feet, has no shopping baskets or carts, has limited counter space at the checkout counter (measuring approximately one foot by one foot), and as a small grocery lacks the inventory of larger stores. (*Id.* at 12-13.) The store did not have a wide variety of highly priced food available for purchase, as is evidenced by the report of the store visit. (*Id.* at 12.) The store has at most one stand-up freezer, which is not large enough to keep a large amount of the meat to be sold in bulk. (*Id.* at 174.) The contractor noted that that the store had "dusty cans/packages,"

suggesting that items were not being purchased with high frequency.  (*Id.* at 12.)  "It is thus unlikely that, without shopping carts and with only a few handheld baskets, a household could carry the items necessary to reach these high dollar amounts."  *Nadia Int'l Mkt. v. United States*, 2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015), *appeal dismissed* (July 28, 2016).  In addition, the record shows that Cecilia's Market patrons had other nearby options at which they would be more likely to make large purchases.  (ECF No. 32-4 at 188 ("The case file indicates that [there] are 63 authorized stores within a one mile radius of Cecilia's Market, including one super store, two supermarkets, one large grocery, and seven small groceries.").)

The FNS's comparison analysis provides further support for its finding in this category.  Cecilia's Market had considerably more high-dollar transactions during the relevant period than the two comparator stores.  (*Id.* at 188.)  While Cecilia's Market had 121 large EBT transactions during the period, Super Star Market had one such transaction and Eddie's Market had 29.  Again, given the similarities of the three stores, Cecilia's Market's significantly higher number of high-dollar transactions supports the FNS's conclusion that Cecilia's Market engaged in trafficking.

The Plaintiffs have submitted no evidence to rebut the EBT data.  Mr. Duchimaza's assertions that Cecilia's Market has fewer large purchases than "most stores" and that his store "carries an abundance of food" are not supported by the record.  (ECF No. 40-2 at 3-4.)  As detailed above, Cecilia's Market had significantly more large purchases than the two comparator stores, and he supplies no evidence of the abundance of food that he carries.  In fact, the report from the contractor's on-site visit suggests that the store does not carry such an abundance.  (ECF No. 32-4 at 14.)  Further, although Mr. Duchimaza does not identify the "study concerning EBT purchase amounts" that supposedly showed that his store had "[fewer] large purchases than most stores" (ECF No. 40-2 at 4), he may be referring to the same study cited in his counsel's letter to FNS.

(ECF No. 32-4 at 109 n.1.)  That study is not part of the record, but an online source corresponding to counsel's citation confirms that it is based on transactions conducted through *all* retail channels – supermarkets, large grocery stores, small grocery stores, convenience stores, gas/grocery, and specialty foods.  *See* "Analysis of EBT Redemption Patterns: Methods and Detailed Tables," Nov, 2005, at A-1 – A-5, http://www.fns.usda.gov/sites/default/files/EBTRedemptionTables.pdf. (last visited 9/27/16).  The average value of the purchases from "most stores" shown from such a study, which includes the whole spectrum of retail food shopping, plainly says little about whether the transaction sizes at a small neighborhood grocery store are unusual.  Here, the FNS appropriately examined a far more tailored comparison base – two other small grocery stores located in the same area – and found Plaintiffs' incidence of high-dollar transactions to exceed the closest comparator by a factor of 4.  Plaintiffs have submitted no evidence to suggest that the inference of trafficking drawn from that finding was invalid.

Mr. Mellinger's analysis of the transactions in Attachment 3 just recasts the data again.  He disputes that the "excessively large" transactions are indicative of trafficking because, for example, "the 121 transactions which exceeded $49.88 represent only 3.2% of 3,279 transactions during the review period."  (ECF No. 31-2 at 12.)  Again, he has no basis to conclude that this particular percentage is not indicative of trafficking because he has no expertise in statistics or in the patterns of EBT data that correspond to trafficking.  His assertion that 3.2% is below the "national average of 16%" is apparently based on the same study reviewed by Mr. Duchimaza and cited in counsel's letter to the FNS.  For the reasons already discussed, the discrepancy between the 3.2% and the "national average" at all retail outlets does not suggest that the FNS's conclusions – which were based on far more similarly situated comparators – are invalid.[4]  Mr. Mellinger also asserts that it

---

[4] The same point applies to Mellinger's observation that "the store's average SNAP transaction over this period was $10.32, or $2.47 less than the average transaction ($12.79) for a small store in Connecticut."  ECF No. 31-2 at 13.

is "more likely" for "residents of the housing projects" to shop at Cecilia's Market than the two comparator stores that the FNS used, despite having no evidence that this is true.  (*Id.*)  He seems to assume that Cecilia's Market is closer to the "housing projects" than the other two stores, despite the fact that there is no evidence in the record that this is so.  He makes this assumption despite having never visited Cecilia's Market or the other two stores.  While Cecilia's Market is .29 and .34 miles away from the two comparator stores, respectively, this does not suggest that the two stores are .29 and .34 miles further from the "housing projects" than Cecilia's Market.  The only evidence in the record regarding the location of Cecilia's Market vis-a-vis the "housing projects" is a brief assertion in a letter submitted by Mr. Duchimaza's accountant stating that "[t]he store is located next to housing projects."  (ECF No. 32-4 at 76.)  There is no further specification of "next to" or anything in the record showing whether Cecilia's Market is closer to these or other housing projects than the two comparator stores. Nor is there any evidence in the record suggesting that residents of housing projects are more likely to engage in high-dollar transactions at a small grocery store than residents of any other type of dwelling.  In short, Mr. Mellinger is speculating and drawing conclusions without any evidentiary basis.

In sum, Plaintiffs have failed to raise a genuine dispute of material fact as to the validity of the FNS's conclusions.  Plaintiffs have not refuted any of the data, and their expert simply provides conclusory opinions uninformed by relevant expertise.  As such, I find that Defendant is entitled to summary judgment on whether Attachments 2 and 3, together with other evidence in the record,

These averages were derived from *all* SNAP transactions -- including both legitimate transactions and suspected trafficking transactions -- at Cecilia's Market and at Connecticut small stores, respectively, during the relevant period. (See ECF No. 32-4 at 49, 188.)  Because there were 3,729 SNAP transactions at Cecilia's Market and undoubtedly hundreds of thousands of such transactions at small Connecticut stores during the relevant period, these averages say little about whether the 121 SNAP transactions at Cecilia's Market flagged as "excessively large" were indicative of trafficking.  Indeed, if anything, the fact that the value of Cecilia's Market's overall average SNAP transaction was slightly lower than the Connecticut small-store norm only makes the 121 "excessively large" transactions at Cecilia's Market more of an anomaly.

indicate trafficking.  *See AJS Petroleum, Inc. v. United States*, 2012 WL 683538, at \*6 (D. Md. Mar. 1, 2012) ("In sum, in attempting to refute the Government's fact-based data, AJS offers only generalized, hypothetical explanations about its sales and business operations during the investigation period. AJS has fallen far short of the specificity required to defeat summary judgment."); *Jackson v. United States*, 2009 WL 941766, at \*7 (N.D. Cal. Apr. 3, 2009) ("In order to preclude summary judgment, Plaintiff must raise material issues of fact as to each of the violations charged against her store that are established in the administrative record.").

### C.  Permanent Disqualification Was Not Arbitrary and Capricious

"If the district court concludes that the decision of the FNS was valid, the court may overturn the sanction imposed only if that sanction is arbitrary and capricious."  *De La Nueces v. United States,* 778 F. Supp. 191, 195 (S.D.N.Y. 1991) (*citing Lawrence v. United States,* 693 F.2d 274, 276 (2d Cir.1982); *Ruszczyk v. Secretary of United States Dep't of Agriculture,* 662 F.Supp. 295, 297 (W.D.N.Y.1986)). "The legislative history of 7 U.S.C. § 2023 distinguished between the Court's *de novo* factual review and its deferential review of the agency's choice of sanction:

> [T]he Committee does not intend that, in the trial *de novo...* the sanction or period of disqualification imposed would itself be subject to judicial review...the trial *de novo...* should be limited to a determination of the validity of the administrative action but not the severity of the sanction. Review of the factual determination that a violation occurred is normal grist for the courts; review of the length of highly discretionary a[sic] sentence of disqualification is not.

*Morales v. United States*, 21 F. Supp. 2d 125, 128 (D. Conn. 1998) (*citing* H.R.Rep. No. 464, 95th Cong., 1st Sess. 397–98; reported in 1977 U.S.Code Cong. and Admin. News 1704, 1978, 2326–27).

"The standard of review for the imposition of a [food stamp program] sanction is a determination whether the Secretary's action was arbitrary or capricious, i. e., whether it was unwarranted in law or without justification in fact." *Willy's Grocery v. United States*, 656 F.2d 24,

26 (2d Cir. 1981) (internal citations omitted).  "A sanction is not arbitrary and capricious if the agency properly adheres to its own regulations and guidelines in imposing a sanction."  *Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997).  "Whether the imposition of a penalty by the FNS was arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment.  *Yafaie v. United States*, 1995 WL 422169, at *1 (S.D.N.Y. July 18, 1995); *see also Lugo v. United States*, 2009 WL 928136, at *3 (S.D.N.Y. Mar. 30, 2009).

The FNS followed its own regulations in determining that Cecilia's Market was engaging in trafficking.  Furthermore, as provided by 7 U.S.C. § 2021(b)(3)(B) and 7 C.F.R. § 278(e)(1)(i), the FNS must permanently disqualify a store upon the "first occasion" of trafficking.  Only if a store qualifies for a CMP may the FNS consider an alternate penalty.  Here, however, Plaintiffs did not even request that the FNS consider a CMP, let alone provide the FNS or the Administrative Review Officer with any evidence of a compliance program as set forth in 7 C.F.R. § 278.6(i).  Furthermore, Plaintiffs have not provided any evidence in support of a CMP to this Court.[5]  Therefore, the decision to disqualify Cecilia's Market permanently from SNAP was not arbitrary and capricious.

### D.  Plaintiffs Were Afforded Due Process

Plaintiffs also claim that the permanent disqualification violates their substantive due process rights, in particular by SNAP regulations that "create onerous requirements for written materials and record-keeping" to be eligible for a CMP.  (ECF No. 1 at 8.)  "A rational basis standard of review is applied in substantive due process claims where the legislative act at issue does not infringe upon a fundamental right."  *Lugo v. United States*, 2009 WL 928136, at *4

---

[5] It is an open question in this Circuit whether a court may consider evidence in support of a CMP provided to the court but not the FNS or Administrative Review Branch.  *See Castillo v. United States*, 989 F. Supp. 413, 417–18 (D. Conn. 1997).  I need not address the question because no such evidence has been provided.

(S.D.N.Y. Mar. 30, 2009).  Because Plaintiffs' permanent disqualification does not infringe upon a fundamental right, it is subject to the rational basis test.  *See id.*

Courts "will invalidate . . . a law on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997).  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

The purpose of SNAP is to "alleviate . . . hunger and malnutrition" in "low-income households."  7 U.S.C.A. § 2011.  "[P]revention of illegal activity within the Program is a legitimate government purpose." *Lugo*, 2009 WL 928136, at *4; *see also Nagi v. U.S. Dep't of Agr.*, 1997 WL 252034, at *3 (S.D.N.Y. May 14, 1997).  Furthermore, courts have found that the statute's strict liability scheme is rationally related to the Government's interest in preventing fraud in the program. *See Traficanti v. United States*, 227 F.3d 170, 175 (4th Cir. 2000) ("Given these factors, we hold that the statute's strict liability regime is rationally related to the government's interest in preventing fraud."); *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) ("Clearly permanently disqualifying store owners guilty of intentionally trafficking in food stamps is rationally related to the legitimate goal of reducing the instances of trafficking violations.").

Furthermore, any allegation by Plaintiffs that they were denied procedural due process in the administrative review process is foreclosed by the *de novo* review of the determination on a fresh record by this Court. *Ibrahim v. U.S. Through Dep't of Agric.*, 834 F.2d 52, 54 (2d Cir. 1987) ("The trial de novo provision clearly afforded full procedural due process.").

**IV.    Conclusion**

29

For the foregoing reasons, I GRANT Defendants' motion for summary judgment and DENY as moot the motion in limine to preclude expert testimony.  The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              September 30, 2016